UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

MARKETING TECHNOLOGY SOLUTIONS, INC.,          :

                    Plaintiff,          :          09 Civ. 8122 (LMM)

      - against -          :          <u>MEMORANDUM AND ORDER</u>

MEDIZINE LLC, DANIEL BRANDT,          :
MICHAEL ROWSOM and ETRUVIAN, INC.,
                            :

            Defendants.          :

------------------------------------------x

McKENNA, D.J.,

Unsealed 5/18/10.
See memo en-
dorsed at 5/18/10.

L_____ JM _____
(SM) 5/18/10

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/18/2010

## 1.

    In this action, plaintiff Marketing Technology Solutions, Inc. ("MTS") asserts that its former employee, defendant Brandt (acting at times through his company, defendant eTruvian, Inc. ("eTruvian")), and another former employee, defendant Rowsom, have acted together for the benefit of defendant MediZine LLC ("MediZine"), a competitor of MTS, by, among other things, transferring to MediZine trade secrets of MTS and infringing MTS' copyrights.

    Both MTS and MediZine present health-related information on interactive websites; users can put questions to the websites, and the websites can put questions to the users; based on the users' input, the programs present advertising, specific to individual users' interests, from health care suppliers such as pharmaceutical manufacturers. "So, for example, if I were to go on

either the plaintiff's website or MediZine's website and the
question [to the user] was . . . what concerns you have, and I say
I have diabetes, they might ask follow-up questions and then they
present an ad that is relevant to that concern."   (Tr., Dec. 4,
2009, at 11 [counsel to MediZine].)

## 2.

This case involves three computer programs that will be
referred to below.

"Promotion Serving Platform Software" ("PSP") refers to
software developed and used by MTS, described in paragraph 2 of its
complaint.    "iConnect" is a computer program, developed by
defendants Brandt and eTruvian, used by MediZine from about 2007 to
about September 30, 2009, described in paragraph 8 of the
complaint.   MTS asserts ownership of PSP and iConnect (the latter
as a work made for hire by Brandt, and has registered copyrights in
PSP, in MTS' name (Compl. Ex. B, Registration No. TX6-938-819, and
a revision thereof, Compl. Ex. C., Registration No. TX6-938-643);
MTS has not registered copyright in iConnect.   "New MediZine
Software" ("NMS") refers to software, developed by MG LLC d/b/a
Tranzact, used by MediZine from October 1, 2009.    (Phares Decl.,
Ex. D ¶ 4; Ex. C at 12.)   The iConnect program was, allegedly,
developed for MediZine by defendant Brandt, at least in part while
Brandt was employed by MTS.   (Compl. ¶ 6.)

2

**3.**

MediZine moves for orders (i) dismissing MTS' Counts I and II, for copyright infringement of PSP and iConnect, respectively, pursuant to Fed. R. Civ. P. 56, (ii) dismissing MTS' Count VII, alleging unauthorized computer access in violation of 18 U.S.C. § 1030, pursuant to id. 12(b)(6), and (iii) dismissing all of the other claims of such complaint (which are alleged under state law) pursuant to 28 U.S.C. § 1367(c)(3).[1]

MTS moves for denial of MediZine's Rule 56 motion pursuant to Rule 56(f), or, in the alternative, for a continuance pursuant to Rule 56(f)(2).

**4.**

After reciprocal expedited discovery by MTS and MediZine, MTS' expert, Dr. Benjamin Goldberg, examined the question whether "any literal or non-literal elements of MTS's source code for its PSP software were copied into either the iConnect source code or the Tranzact source code." (Goldberg Report, Oct. 26, 2009, ¶ 8.)[2]

---

[1] There is not complete diversity in this case because both MTS and MediZine are Delaware corporations. (Compl. ¶¶ 16, 17.)

[2] "Source code" refers to "a series of instructions written in a computer language such as COBOL, BASIC or FORTRAN," Softel Inc. v. Dragon Med. & Scientific Comm's., Inc., 118 F.3d 955, 958 n.3 (2d Cir. 1997) (citing Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 698 (2d Cir. 1992)). "Once the source code has been completed, the second step is to translate or 'compile' it into object code." Altai, 982 F.2d at 698. "'Object code' is a machine-readable binary translation of source code." Softel, 118 F.3d at 959 n.4). "Source code" and "object code" are "the literal elements of computer programs." Altai, 982 F.2d at 702. Both literal and non-literal elements of a computer program may be protected by copyright." Id. at 701-02.

MTS, on the basis of Dr. Goldberg's Report, has identified two ways in which, it argues, iConnect infringes PSP. First, according to Dr. Goldberg, a file -- referred to by the parties as "engine.js" -- in PSP "was copied virtually wholesale into the iConnect code." (Goldberg Report ¶ 23.) Second, "[n]on-literal aspects of the PSP code were also copied into the iConnect code" (id. ¶ 24); MTS refers to the relevant portion of the PSP program as the "Campaign Ranking Code." (See, e.g., Tr., Dec. 4, 2009, at 41.) "Although the code that computes the ranking of each campaign is written in a different language in the iConnect software than in the PSP software, the two codes perform the same computation in the same series of steps and produce the same result." (Goldberg Report ¶ 25.)

**5.**

MTS' Count I asserts MediZine's infringement of MTS' copyrights in PSP on the basis of MediZine's copying from PSP, in iConnect, of the "engine.js" file (literally) and the Campaign Ranking Code (non-literally).

In a copyright case, as in any other, to obtain summary judgment, a party must demonstrate that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The court 'must draw all reasonable inferences and

4

resolve all ambiguities in favor of the non-moving party.'" Castle Rock Ent'ment, Inc. v. Carol Pub. Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998) (quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 26 (2d Cir. 1988)).

> To sustain a claim of copyright infringement, a plaintiff must demonstrate first that a copyrighted work was actually copied, and second, that the copying amounted to an improper or unlawful appropriation. After proving that the copyrighted work was actually copied, a plaintiff must establish that the copying was improper or unlawful by showing that the second work bears a "substantial similarity" to protected expression in the copyrighted work.

Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 69-70 (2d Cir. 1999) (quoting Repp v. Webber, 132 F.3d 882, 889 (2d Cir. 1997) (other citations omitted)).

Here, MediZine assumes, for purposes of the present motion, that MTS has established that it has a valid copyright in PSP and that there was copying by MediZine. (Tr., Dec. 4, 2009, at 11.)

**6.**

As to the claim of infringement based on the inclusion in iConnect of "engine.js," MediZine's responsive argument is that the presence of the few lines of code comprising "engine.js" is de minimis.

"To establish that the infringement of a copyright is de minimis, and therefore not actionable, the alleged infringer must demonstrate that the copying of the protected material is so

5

trivial 'as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying.'"  Sandoval v. New Line Cinema Corp., 147 F.3d 215, 217 (2d Cir. 1998) (quoting Ringgold v. Black Ent'ment Television, Inc., 126 F.3d 70, 74 (2d Cir. 1997)).

In Sandoval, a scene in a motion picture showed a light box with photographic transparencies (ten of which were reproductions of the plaintiff's self-portraits) attached to it. 147 F.3d at 216.

> At approximately one hour and seventeen minutes into the movie, the light box is turned on, allowing light to pass through the non-opaque portions of the transparencies posted on the box. During the next minute and a half, the light box and Sandoval's pictures, or portions of each, are briefly visible in eleven different camera shots. The longest uninterrupted view of the light box lasts six seconds, but the box is otherwise visible, in whole or in part, for a total of approximately 35.6 seconds.  The photographs never appear in focus, and except for two of the shots, are seen in the distant background, often obstructed from view by one of the actors.  In these two shots, figures in the photographs are barely discernable, with one shot lasting for four seconds and the other for two seconds.  Moreover, in one of the shots, after one and a half seconds, the photograph is completely obstructed by a prop in the scene.

Id.  The Court of Appeals concluded that the use in the motion picture of the plaintiff's works was de minimis, so that no cause of action lay for copyright infringement.  Id. at 218.

The Court of Appeals in Sandoval pointed out that the "inquiry into the substantial similarity between a copyrighted work

6

and the allegedly infringing work must be made on a case-by-case basis, as there are no bright-line rules for what constitutes substantial similarity." <u>Id.</u> at 217. <u>Sandoval</u> also notes that courts will look at "the amount of the copyrighted work that was copied," <u>id.</u>, and further points out that, in the case of visual works, "observability of the copyrighted work in  the allegedly infringing work " is relevant. <u>Id.</u> (citation omitted). The Second Circuit has also said, it must, however, be added, that "the quantitative analysis of two works must always occur in the shadow of their qualitative nature." <u>Nihon</u>, 166 F.3d at 71.

MediZine's "engine.js" argument is largely quantitative: it argues that "PSP consists of 953,612 lines of code, and iConnect contains 233,751 lines of code.  Of those, only 437 lines of code are even allegedly similar."   (Def. Mem. at 7 (citations omitted).)[3]  MTS' expert states that "[t]he code in engine.js drives much of the user interface when a user is answering survey questions concerning health and medication issues."  (Goldberg Report ¶ 22; <u>see also</u> MTS Reply Mem. at 8.)

It may be granted that the "engine.js" code is a quantitatively very small part of the programs of which it is a part.  At the same time, there is no substantial dispute that it performs a real function in at least the PSP program.   The

---

[3] MediZine adds that these lines of code do not serve a function in iConnect.  (<u>Id.</u> at 7-8.)

smallness alone is not enough by itself to avoid liability.  Nihon, 166 F.3d at 71-72.  The qualitative value in the equation, on the present record, however, remains an issue of fact.  "A de minimis defense does not apply where the qualitative value of the copying is material."  Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 208 (3d Cir. 2002).

**7.**

As to the Campaign Ranking Code, MediZine's argument is that it is merely an "algorithm" (Tr., Dec. 4, 2009, at 9, and passim)[4], or a "process" or "method of operation" within the meaning of 17 U.S.C. § 102(b).  (MediZine Mem. at 5-6.)

Section 102(b) of the Copyright Act provides that :  "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b).

"Section 102(b) assumes the existence of a protected work -- 'an original work of authorship' -- but cautions that protection for such an original work of authorship does not extend to any unprotectible components contained therein, or to concepts, procedures, processes, systems, and methods of operation."  2

---

[4] MTS also at times refers to the Campaign Ranking Code as an "algorithm."  (Tr., Dec. 4, 2009, at 46, and passim.)

8

William F. Patry, <u>Patry on Copyright</u> § 4.30, at 4-108 (2009)
(footnotes omitted).  The reason for excluding ideas, procedures,
processes, systems, methods of operation, concepts, principles or
discoveries from copyright protection "is to avoid monopoly power
being exercised in an across-the-board manner, that is, without
regard to the particular characteristics of any individual work."
<u>Id.</u> at 4-109; <u>see also</u>, <u>Attia v. Soc'y of N.Y. Hosp.</u>, 201 F.3d 50,
53-55 (2d Cir. 1999); <u>Altai</u>, 982 F.2d at 708; <u>Apple Computer, Inc.
v. Franklin Computer Corp.</u>, 714 F.2d 1240, 1252-53 (3d Cir. 1983).

    Section 102(b) does not use the word "algorithm," but the
word has been used in copyright case law.  <u>See</u> <u>Torah Soft Ltd. v.
Drosnin</u>, 136 F.Supp.2d 276, 291 (S.D.N.Y. 2001) ("An
algorithm . . . is clearly a method of operation which cannot be
protected."[5]  Nevertheless, it will be clearer to use the language
of Section 102(b) rather than the word "algorithm" in considering

---

[5] The term is also used in the patent context.  "A procedure for
solving a given type of mathematical problem is known as an 'algorithm.'"
<u>Gottschalk v. Benson</u>, 409 U.S. 63, 65 (1972); <u>Diamond v. Diehr</u>, 450 U.S.
175, 185-86 & n.9 (1981).
    It is not at all clear that the identification of a component of
a computer program as an "algorithm" ends the analysis.  "Although
algorithms are typically perceived as individual components of a software
design, they have a number of component parts which are organized into
a coherent whole. Moreover, algorithms, conceptually speaking, determine
the behavior of the programs that embody them.  Viewed in this way, even
individual algorithms seem to be among the aspects of programs that could
be protected within an industrial compilation framework."  Samuelson,
Davis, Kapor & Reichman, <u>A Manifesto Concerning the Legal Protection of
Computer Programs</u>, 94 Colum. L. Rev. 2308, 2383 (1994) (footnotes
omitted).  Those authors define an "algorithm" as "'a prescribed set of
well-defined, unambiguous rules or processes for the solution of a
problem in a finite number of steps.'"  <u>Id.</u> at 2321 n.37 (quoting
<u>Webster's New World Dictionary of Computer Terms</u> (3d ed. 1988)).

whether MediZine's non-literal copying of the Campaign Ranking Code is or can be a violation of MTS' copyright in PSP.

It is necessary first to understand what the Campaign Ranking Code is.  Recognizing that "the value in a program lies in its behavior," Samuelson, supra, note 5 at 2323, that means what the program does.

According to MTS' expert, the Campaign Ranking Code computes "the order in which campaigns (offers related to pharmaceutical products) appear on a web page -- based on a ranking function applied to each campaign," and is "virtually identical in the PSP and iConnect code." (Goldberg Report ¶ 24.)  "Although the code that computes the ranking of each campaign is written in a different language in the iConnect software than in the PSP software, the two codes perform the same computation in the same series of steps and produce the same result." (Id. ¶ 25.)  The PSP code "iterates over each campaign, computing the campaign's rank by first computing the previous day's take rate, which is the number of takes (i.e., the number of times the offer was signed up for divided by the number of views) for that campaign." (Id.)  With a relatively small variation, the iConnect code does the same thing. (Id. ¶ 26.)  Counsel for MTS has expressed the "idea" of the Campaign Ranking Code:

> The algorithm [Campaign Ranking Code] that is at issue here is the one that determines how many ads or what ads the user sees, the order in which they appear.  From a business standpoint this is how MTS

10

> makes money.  This is what differentiates the MTS
> platform from other online lead generation
> platforms.  This is the algorithm that determines
> how MTS prices its services and how MTS negotiates
> with its clients in terms of the way in which their
> campaigns and their ads are going to appear.

(Tr., Dec. 4, 2009, at 47.)

MediZine does not show that the protectable expression claimed by MTS in the Campaign Ranking Code "was dictated by considerations of efficiency, so as to be necessarily incidental to [the] idea; required by factors external to the program itself; or taken from the public domain and hence is nonprotectable expression." Altai, 982 F.2d at 707.

Nor is the Campaign Ranking Code a means of giving instructions to a computer, as was the menu command hierarchy in Lotus Development Corp. v. Borland Int'l, Inc., 49 F.3d 807 (1st Cir. 1995), but, rather, guides the PSP's interaction with users of the website.

And, significantly for purposes of the present motion, MediZine has not shown that the idea of the Campaign Ranking Code is not only one of a number of ways to express that idea, and so copyrightable. See Apple, 714 F.2d at 1253 ("If other programs can be written or created which perform the same function as an Apple's operating system program, then that program is an expression of the idea and hence copyrightable.")

**8.**

11

For the reasons so far set forth, MediZine's motion for summary judgment dismissing Count I of the complaint is denied.

**9.**

MediZine's motion for summary judgment dismissing Count II is granted.

Initially, MediZine argued that the fact that copyright in iConnect had not been registered deprived this Court of jurisdiction under 17 U.S.C. § 411(a) (MediZine Mem. at 10-11), which the Second Circuit, in <u>In re Literary Works in Electronic Databases Copyright Litig.</u>, held to be a "jurisdictional prerequisite to a copyright infringement suit." 509 F.3d 116, 125 (2d Cir. 2007) (footnote omitted).   In <u>Reed Elsevier, Inc. v. Muchnick</u>, 130 S. Ct. 1237 (2010), however, the Supreme Court reversed the Second Circuit, concluding that 17 U.S.C. § 411(a) "does not implicate the subject-matter jurisdiction of federal courts." (<u>Id.</u> at 1248.)

The Supreme Court did not conclude, on the other hand, that 17 U.S.C. § 411(a) was to be ignored.  It recognized that that section's "registration requirement is a precondition to filing a claim that does not restrict a federal court's subject-matter jurisdiction" (<u>id.</u> at 1241), and expressly declined to address whether the statutory registration requirement was a "mandatory precondition to suit that . . . district courts may or should

12

enforce <u>sua sponte</u> by dismissing copyright infringement claims involving unregistered works." (<u>Id.</u> at 1249.)

The language of 17 U.S.C. § 411(a) is clear, MTS has not shown that it comes within any of the exceptions to the registration requirement noted by the Supreme Court in <u>Reed Elsevier</u> (<u>see</u> 130 S. Ct. at 1246), and summary judgment is granted dismissing Count II.[6]

## 10.

MediZine moves for dismissal, pursuant to Fed. R. Civ. P. 12(b)(6), of Count VII of the complaint, alleging the violation of 18 U.S.C. § 1030, the Computer Fraud and Abuse Act ("CFAA").

"In deciding whether a complaint states a claim, a 'court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor.'" <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 184 (2d Cir. 2002) (quoting <u>Hernandez v. Coughlin</u>, 18 F.3d 133, 136 (2d Cir. 1994)). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" <u>ATSI Comm's, Inc. v. The Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir.

---

[6] The Court does not act <u>sua sponte</u>. The parties have taken the opportunity to give their views on <u>Reed Elsevier</u> to the Court in writing. <u>See</u> Ms. Finguerra-DuCharme's letter to the Court of March 4, 2010, and Ms. Phares' letter to the Court of the same date.

2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)) (footnote omitted).

The CFAA provides that: "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). The statute further provides that: "A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." <u>Id.</u>

In its brief, MTS suggests that the complaint intends to assert a claim under 18 U.S.C. § 1030 subsections (a)(2)(C) and (a)(4) and as to the (c)(4)(A)(i) factor, it claims that the conduct involved is that described in (c)(4)(A)(i)(I). (MTS Mem. at 17-18.)

18 U.S.C. § 1030(a)(2)(C) subjects to liability "[w]hoever . . . intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." <u>Id.</u> § (a)(4) subjects to liability

> [w]hoever . . . knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period.

A "protected computer" under the CFAA includes a computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States."   Id. § 1030(3)(2)(B).

The (c)(4)(A)(i) factor apparently relied on by MTS is, in a civil context, "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."  18 U.S.C. § 1030(c)(4)(A)(i)(I).

The CFAA defines both "damage" and "loss."  "[T]he term 'damage' means any impairment to the integrity or availability of data, a program, a system or information."  Id. § 1030(e)(8).

> [T]he term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

Id. § (e)(11).

The term "loss" has been construed to mean "a cost of investigating or remedying damage to a computer, or a cost incurred because the computer's service was interrupted." Nexans Wires S.A. v. Sark-USA, Inc., 319 F.Supp.2d 468, 475 (S.D.N.Y. 2004).  "[L]ost revenue due to lost business opportunity" does not come within the statutory definition of "loss," id. at 477, and "the loss of

15

business due to defendants' eventual use of the information, rather
than a loss of business because of computer impairment, was too far
removed from computer damage to count toward the jurisdictional
threshold."   Id. at 477 (discussing the court's holding in
Register.com, Inc. v. Verio, Inc., 126 F.Supp.2d 238, 252 n.12
(S.D.N.Y. 2000), aff'd 356 F.3d 393 (2d Cir. 2004)).[7]  "In sum,
revenue lost because the information was used to unfairly compete
after extraction from a computer does not appear to be the type of
'loss' contemplated by the statute."  Nexans, 319 F.Supp.2d at 478.

        MediZine argues that MTS has not alleged (and cannot
allege) that Brandt accessed MTS' computer(s) without authorization
or in excess of authorization, because of the broad access Brandt
had as an employee. (MediZine Mem. at 13-14.)   In light of the
Employment  Agreement  between  Brandt  and  MTS,  and  its  broad
confidentiality section (see Complaint Ex. A, ¶ 5), in the Court's
view, Brandt's access to MTS' computer(s) exceeded his authorized
use.  EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 581-
84 (1st Cir. 2001).[8]

---

        [7] In Register.com, Circuit Judge Fred Parker's draft dissent (the
circumstances resulting in the publication of which are set forth at 356
F.3d at 395 n.1) states:  "We agree with the (near) unanimous view that
any civil action under the CFAA involving 'damage or loss,' must satisfy
the $5,000 threshold."  356 F.3d at 439 (quoting 18 U.S.C. § 1030(g) and
citing id. § (e)(8)(A))  (other citations omitted).

        [8] The Second Circuit's decision in United States v. Morris, 928 F.2d
504 (2d Cir. 1991), see EF Cultural Travel, 274 F.3d at 582 n.10, does
not require a different result.  Here, it is alleged that Brandt violated
18 U.S.C. § 1030(a)(4) by accessing a computer with the intent to defraud
and there is no suggestion that Brandt was authorized to defraud his

In its reply brief, but not in its initial brief, MediZine argues that it cannot be held vicariously liable for conduct by Brandt in violation of the CFAA. (MediZine Reply Mem. at 11-12.) Even if that is so -- because, as MediZine asserts, "Brandt was an independent contractor to MediZine and not an employee or agent" (id. at 11) -- the argument fails to take into consideration the fact that the complaint alleges that MediZine, eTruvian and Rowsom conspired with Brandt to intentionally exceed Brandt's authorized access to MTS' computer(s).

In any event, since the argument was raised only in a reply memorandum, the Court does not decide it on the present record.

\*       \*       \*

While the Court does not conclude that MTS cannot allege a claim under the CFAA, it is clear that the present complaint does not adequately allege such a claim, in two particulars:  (1) the complaint must allege the particular provisions of the CFAA that MTS claims to have been violated, as well as the Section 1030(c)(4)(A)(i) factor(s) which MTS claims to have been involved, with facts to support the statutory allegations; and (2) the complaint must also allege with some particularity the "damage" and

---

employer.

Morris, a criminal case under an earlier version of the CFAA, focused on whether the defendant had accessed a federal government computer without authorization -- not on whether he had exceeded authorization.

17

"loss" (as defined in the CFAA) claimed to be involved, with, moreover, facts showing that the $5,000 threshold of Section 1030(a)(4) is satisfied.

Count VII is dismissed.  MTS is to submit an amended complaint amending Count VII only, within 20 days of the date hereof.

**11.**

Since Count I remains pending, MediZine's motion for dismissal of the state law counts is denied.

**12.**

For the foregoing reasons:  (i) defendants' motion for summary judgment dismissing Count I is denied; (ii) defendants' motion for summary judgment dismissing Count II is granted; (iii) defendants' motion for dismissal of Count VII for failure to state a claim is granted, with leave to plaintiff to replead that Count within 20 days; and (iv) defendants' motion to dismiss all state law claims for lack of subject matter jurisdiction is denied.

Plaintiff's motion for relief under Fed. R. Civ. P. 56(f) is denied as moot.[9]

SO ORDERED.

Dated:  April 23, 2010

Lawrence M. McKenna
U.S.D.J.

---

[9] The parties are to complete all discovery not later than September 30, 2010.
    The parties are to advise the Court within 10 days of the date hereof as to what parts hereof require redaction prior to public filing.